**UNITED STATES of America, Appellee,**

v.

**Andrew J. CRAWFORD, Appellant.**

**No. 93–3920.**

United States Court of Appeals, Eighth Circuit.

Submitted: March 14, 1994.

Decided April 6, 1994.

Carter Collins Law, St. Louis, MO, argued, for appellant.

Mitchell Francis Stevens, St. Louis, MO, argued (Edward L. Dowd, Jr., Mitchell F. Stevens and John Ottenad, on the brief), for appellee.

Before BOWMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Andrew Crawford appeals the trial court's denial of his motion to dismiss an indictment charging him with fraudulent securities transactions. He argues that the prosecution of those charges was in violation of an immunity agreement given to him by the government. We affirm the trial court.[1]

## I.

In the course of investigating fraudulent bank transactions, federal agents interviewed Andrew Crawford, a former securities broker, in December, 1991. In that interview, Mr. Crawford admitted executing false bond

---

1. The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri, adopting the report and recommendations of the Honorable Lewis M. Blanton, United States Magistrate Judge for the Eastern District of Missouri. *See* 28 U.S.C. § 636(b)(1)(B).

sale confirmations in 1989 and 1990 with respect to a bank holding company's trading account in order to obtain money to cover the losses in two personal trading accounts opened by Donald Chilton, a director of the bank holding company. Mr. Crawford stated, however, that all of those false confirmations were sent at Mr. Chilton's request. Mr. Crawford also stated that, when federal authorities and the brokerage began investigating the transactions, he agreed, at Mr. Chilton's request, to take all of the blame for the transactions so that the brokerage, the bank holding company, and several subsidiary banks would not collapse. In exchange, Mr. Crawford asserted, Mr. Chilton promised to take care of Mr. Crawford financially in the future. At a meeting with brokerage representatives in 1990, Mr. Crawford stated, he did in fact take sole responsibility for the fraudulent transactions.

In March, 1992 (three months after the initial interview), Mr. Crawford met with federal agents again. At that time, they gave him a letter from the government stating that "if Mr. Crawford agrees to provide complete and truthful cooperation to the government in its investigation relating to certain banking and securities transactions entered into by Donald Chilton and others, ... the United States agrees that no prosecution will be initiated ... against [Mr.] Crawford for any crimes which he may have committed regarding [those] transactions.... [I]n the event that [Mr.] Crawford does not comply with conditions of completeness and truthfulness, this agreement is null and void and prosecution may proceed on any charges to which he may be subject." Although Mr. Crawford evidently did not sign the letter to indicate his acceptance of its conditions, he did keep it and orally acknowledged his understanding of it and his intention to cooperate. (Neither the government nor Mr. Crawford argues that there was no agreement.)

During the subsequent interview on that day, Mr. Crawford repeated the account of events that he had given at the first interview. The federal agents asked if Mr. Crawford had ever taken sole responsibility for the scheme other than at the meeting with the brokerage representatives. Mr. Craw-ford denied that he had ever done so. At that point, the federal agents confronted Mr. Crawford with a tape recording that he had given to a close friend who was also a co-worker, apparently sometime in 1990, and on which he took sole responsibility for the scheme and contemplated suicide because of it. Mr. Crawford said then that he had "forgot[ten]" the tape. The federal agents asked for corroboration that Mr. Chilton had known of the false confirmations from the beginning and that Mr. Crawford had taken all of the blame only because Mr. Chilton had asked him to. Mr. Crawford then offered the names of several people to whom, he said, he had talked in 1990 and who could therefore corroborate his assertions of Mr. Chilton's involvement. Mr. Crawford acknowledged that he had never told his wife of Mr. Chilton's alleged complicity.

A few weeks later, federal agents interviewed two of the persons Mr. Crawford had said would corroborate his statements about Mr. Chilton's involvement. Each stated that Mr. Crawford had never said anything in 1990 or 1991 about either his own involvement or Mr. Chilton's involvement in the scheme. One person stated that Mr. Crawford had told him only within the previous week (after Mr. Crawford's second interview with the federal agents) that Mr. Chilton was responsible for the scheme. The day after those interviews, the federal agents contacted Mr. Crawford's lawyer and told him of their belief that Mr. Crawford had not been truthful in his interviews with them. Mr. Crawford's lawyer responded that he was having his own problems with Mr. Crawford (apparently related to fees).

A few days later, federal agents interviewed another of the persons named by Mr. Crawford as someone who could corroborate his statements about Mr. Chilton's involvement. That person stated, instead, that although he and Mr. Crawford had talked in 1990 about Mr. Crawford's own acts with respect to the fraudulent transactions, Mr. Crawford never implicated Mr. Chilton in the scheme. That person also alluded to a tape recording that Mr. Crawford gave to his wife, evidently sometime in 1990, in which he took sole responsibility for the scheme. In early

1993, federal agents interviewed Mr. Chilton. He denied any knowledge of the scheme until 1990, when, he said, federal authorities and the brokerage made him aware of it.

A few days after federal agents interviewed Mr. Chilton, a grand jury indicted Mr. Crawford, Mr. Chilton, Mr. Chilton's wife, and Mr. Chilton's brother, alleging, first, conspiracy to deceive federal bank examiners and, second, various specific fraudulent securities transactions designed to obtain money from the bank holding company. Mr. Chilton and his wife committed suicide after the indictment was made public. A superseding indictment, naming only Mr. Crawford and Mr. Chilton's brother as defendants, was issued about six weeks later.

Mr. Crawford moved to dismiss the indictment, citing the immunity agreement given to him by the government. Adopting the report and recommendations of a magistrate judge, the trial court denied the motion. In late 1993, Mr. Crawford pleaded guilty to one count of the superseding indictment, reserving the right to appeal the denial of his motion to dismiss. *See* Fed.R.Crim.P. 11(a)(2).

## II.

Mr. Crawford argues, first, that he did not breach the immunity agreement and therefore that the government should be held to its promise not to prosecute him. He argues in the alternative that if he did breach the agreement by not being completely truthful, the breach was not a material one. Finally, he seems to argue that even if the breach was a material one, the government never gave him a chance to cure it and therefore that the prosecution of the charges against him was a violation of his due process rights.

■ It is well settled that immunity agreements are analogous to plea agreements, *see, e.g., United States v. Brown,* 801 F.2d 352, 354 (8th Cir.1986), and therefore may be enforced under the principles of contract law, *see, e.g., United States v. Johnson,* 861 F.2d 510, 512 (8th Cir.1988), within the context of constitutional safeguards for due process, *see, e.g., United States v. Britt,* 917 F.2d 353, 359 (8th Cir.1990), *cert. denied,* 498 U.S. 1090, 111 S.Ct. 971, 112 L.Ed.2d 1057 (1991). Only a material breach is sufficient to excuse the government of its performance. *See, e.g., United States v. Britt,* 917 F.2d at 360–61; *see also United States v. Gerant,* 995 F.2d 505, 508–09, 509 n. 4 (4th Cir.1993); *United States v. Ataya,* 864 F.2d 1324, 1330, 1337 (7th Cir.1988); *United States v. Gonzalez–Sanchez,* 825 F.2d 572, 578–79 (1st Cir.1987), *cert. denied,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987); and *United States v. Wood,* 780 F.2d 929, 931–32 (11th Cir.1986) (*per curiam*), *cert. denied,* 479 U.S. 824, 107 S.Ct. 97, 93 L.Ed.2d 48 (1986). "In determining whether a failure to render ... performance is material, the following circumstances are significant: ... the extent to which the injured party will be deprived of the benefit which he reasonably expected; ... the likelihood that the party failing to perform ... will cure his failure, taking account of all the circumstances; [and] ... the extent to which the behavior of the party failing to perform ... comports with standards of good faith and fair dealing." *Restatement (Second) of Contracts* § 241 at 237 (1981); *see also Cedar Point Apartments, Ltd. v. Cedar Point Investment Corp.,* 693 F.2d 748, 754 n. 4 (8th Cir.1982), *cert. denied,* 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983), citing § 241 with approval.

■ In the report and recommendations on Mr. Crawford's motion to dismiss, the magistrate judge essentially held that the inconsistencies in Mr. Crawford's statements about Mr. Chilton's involvement (telling federal agents that Mr. Chilton was aware of the scheme from its inception, but telling others that the sole responsibility for the scheme was Mr. Crawford's own), which were discovered before the indictment, amounted to a material breach of Mr. Crawford's promise to "provide complete and truthful cooperation." Leery of those inconsistencies and dubious about Mr. Crawford's reliability, the government decided not to present Mr. Crawford as a witness before the grand jury.

■ Although Mr. Crawford offers several explanations for those inconsistencies, we believe that the failure of others specifically named by him to provide corroboration for

his assertions of Mr. Chilton's complicity, in conjunction with his own admission that he never told his wife of Mr. Chilton's involvement and with the tape he made for his wife on which he took sole responsibility for the scheme, is plentiful support for the government's conclusion that Mr. Crawford had breached in a material way his promise to be truthful. *See, e.g., United States v. Gerant,* 995 F.2d at 508–09, and *United States v. Britt,* 917 F.2d at 355–56, 359–60. We also hold that Mr. Crawford was given adequate opportunity to cure that breach when the federal agents asked him for the names of people who could corroborate the version of events that he had given to them. *See, e.g., United States v. Baldacchino,* 762 F.2d 170, 179 (1st Cir.1985).

### III.

For the reasons stated, we affirm the judgment of the trial court.