UNITED STATES of America,

v.

Steven HOFFENBERG, Defendant.

No. 94 Cr. 0273 (RWS).

United States District Court,
S.D. New York.

Dec. 18, 1995.

Mary Jo White, United States Attorney for Southern District of New York, New York City, for United States of America; Amy E. Millard, Jonathan Rosenberg, Assistant U.S. Attorney of counsel.

Hoffman & Pollok New York City, for defendant; Jeffrey Hoffman, Susan C. Wolfe, of counsel.

SWEET, District Judge.

The defendant Steven Hoffenberg ("Hoffenberg") has moved under the unusual circumstances described below to enforce the Cooperational Plea Agreement of September 23, 1993 (the "Agreement") between Hoffenberg and the United States Attorneys for the Southern District of New York and the Northern District of Illinois (the "Government").

Upon the hearing on contested facts, the prior proceedings and the facts and conclusions set forth below, the motion is denied.

### The Issues

This proceeding sets the framework for the final resolution of the responsibility of Hoffenberg for the massive frauds at his company, Towers Financial Corporation ("Towers") in the early 90's which resulted in more than $400 million in losses. While other cases involving the fraud remain open, Hoffenberg's sentence upon his criminal liability may well turn upon the applicability of the Section 5K1.1(a)(1)–(5) exception to the Sentencing Guidelines which he has sought to enforce in this proceeding.

This determination must resolve the following issues: (1) the applicable standard and procedures for the enforcement of cooperation agreements, (2) the factual findings as to the conduct of Hoffenberg and the Government, (3) the effect of any partial

performance by the Government, and (4) the propriety of the Government's refusal to comply with the Agreement. It is anticipated that with these determinations in hand the Government and Hoffenberg will proceed to a sentencing hearing.

### Prior Proceedings

The prior proceedings have been described in prior opinions of this Court familiarity with which is assumed. *See United States v. Hoffenberg,* 859 F.Supp. 698 (S.D.N.Y.1994) (the "July Opinion"), *United States v. Hoffenberg,* 1995 WL 10840 (S.D.N.Y. Jan. 12, 1994). Some restatement is required in the interest of continuity.

Sometime prior to 1991, Hoffenberg and a number of corporate entities with which he was associated, including Towers, and others, came under investigation by the Securities & Exchange Commission ("SEC"). The SEC filed an action in this District against Hoffenberg and others on February 8, 1993, and on February 17, 1993, Hoffenberg and certain other defendants agreed to a preliminary injunction issued by the Honorable Whitman Knapp (the "Consent Order") which, among other things, enjoined Hoffenberg and "each of his controlled, related, or affiliated entities . . . to hold and retain within their control, and otherwise prevent any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal of any funds, or other properties." It also allowed for "ordinary living and business expenses. . . ."

In 1993 the United States Attorney for the Southern District of New York began a criminal investigation against Hoffenberg and others for conspiracy to obstruct the SEC's investigation during 1991 and 1992, and for various other criminal violations of the securities laws.

In March 1993 Hoffenberg, through counsel, initiated a number of meetings which culminated in an oral understanding. Pursuant to that understanding, Hoffenberg agreed to talk to representatives of the United States Attorney's Office for the Southern District of New York and the Northern District of Illinois, the FBI, and the SEC (collectively, the "Government"). In return, the Government agreed to grant Hoffenberg limited immunity for each of his proffers or debriefings.

On September 24, 1993, Hoffenberg and the Government entered into the Agreement dated September 23, 1993.

On January 27, 1994, and on February 14, 1994, the Government confronted Hoffenberg with allegations that he had violated his obligations under the Agreement. On February 17 he was advised that the Agreement had been terminated, and he was arrested.

On April 19, 1994 he was indicted in the Northern District of Illinois on fraud charges. On April 20, 1994 he was indicted in the Southern District of New York and charged with the four counts contemplated in the Agreement, as well as six additional counts alleging substantive securities fraud violations in connection with the sale of notes and bonds of Towers; additional violations of the mail fraud statute, and obstruction of justice by disobeying an order of the United States District Court for the Southern District of New York.

Hoffenberg moved to enforce the Agreement and by opinion dated July 21, 1994 (the "July Opinion"), *see United States v. Hoffenberg,* 859 F.Supp. 698 (S.D.N.Y.1994), his motion was denied as premature. He then moved to reargue his earlier motion and to suppress the statements which he had made in reliance upon the Agreement, which motion was denied by an opinion rendered on January 11, 1995 (the "January Opinion").

After the filing of the Indictment against him, the Government continued to permit him to plead to the charges as had been set forth in the Agreement and on April 20, 1995, Hoffenberg entered a guilty plea to four counts: (i) conspiracy to violate the securities laws by fraudulently selling securities; (ii) mail fraud, (iii) conspiracy to obstruct justice; and (iv) tax evasion.

The Government continued also its previously stated refusal to file a motion to advise the sentencing judge of Hoffenberg's cooperation and to request sentencing in the light of the factors set forth in Section 5K1.1(a)(1)–(5) of the Sentencing Guidelines (the "5K1 Letter"). The parties in a pretrial confer-

ence agreed upon the necessity of a hearing to resolve the factual contentions. From June 5 to June 14, 1995, the parties submitted evidence by way of testimony and exhibits. Post hearing briefs were filed. On September 12, 1995 final argument was heard. A final submission was made to the Court on December 1, 1995 and the issues were considered fully submitted at that time.

*Facts*

### The Background and the Agreement

Sometime in 1991 Hoffenberg and a number of corporate entities with which he was associated, including Towers, came under investigation by the SEC for securities fraud arising out of the affairs of Towers. On February 8, 1993, the SEC filed an action in this District. *See SEC v. Towers Financial Corporation, et al.,* 93 Civ. 0744, 1993 WL 276935 (1993) (WK) (the "SEC Action"). As it related directly to Hoffenberg, the complaint alleged that he violated the anti-fraud provisions of the securities laws by false and misleading statements to investors who had purchased $215 million in promissory notes issued by Towers. The SEC also charged Hoffenberg with failing to register the offerings of promissory notes with the SEC, and selling his Towers common stock while in possession of inside information that the stock was worthless.

In early 1993, the United States Attorney for the Southern District of New York commenced the criminal investigation against Hoffenberg and others for conspiracy to obstruct the SEC's investigation during 1991 and 1992 and for various other criminal violations of the securities laws. An investigation was also commenced in the Northern District of Illinois with respect to a scheme to defraud the Illinois Department of Insurance and two Illinois insurance companies acquired by Towers.

In March 1993, Hoffenberg and the Government agreed that Hoffenberg would talk to representatives of the United States Attorney's Office for the Southern District of New York and Northern District of Illinois, the FBI and the SEC and receive limited immunity for these proffers. On at least 22 separate occasions, Hoffenberg and his counsel met with representatives of the Government who were interested in the subject matter of Hoffenberg's debriefings.

On September 24, 1993, the parties entered into the Agreement, dated September 23, which provided that Hoffenberg would be charged with the four felony counts in a Southern District Information. It was further agreed that Hoffenberg would plead guilty to and be sentenced in this District on an information filed in the Northern District of Illinois, charging him with one count of mail fraud.

The Agreement also provided in relevant part as follows:

If Steven Hoffenberg fully complies with the understandings specified in this Agreement, he will not be further prosecuted by the Offices for any crimes related to his participation in: (i) the fraudulent sale of unregistered debt securities, namely, promissory notes and bonds, of Towers Financial Corporation ("Towers") from in or about 1986 through in or about February 1993; (ii) making illegal payments to representatives of pension funds to induce the purchase of Towers' securities, from in or about 1989 to in or about February, 1993; (iii) making illegal payments to representatives of a foreign country in order to secure a loan to Towers from that country's bank, from in or about 1989 to in or about February 1993; (iv) obstructing the Securities and Exchange Commission's investigation of the fraudulent sale of Towers' securities from in or about 1988 to in or about September 1993; (v) a scheme to illegally convert to Towers' use monies collected by Towers as collection agent for its clients, from in or about 1980 to in or about April 1993; (vi) the failure to report on his Individual U.S. Income Tax Returns for the calendar years 1987 through 1991 income Steven Hoffenberg obtained by having corporate entities controlled by him pay his personal expenses; and (vii) a scheme to defraud, misappropriate, and misuse the funds and assets of two Chicago insurance companies, from in or about October 1987 to in or about 1992. In addition, if Steven Hoffenberg fully complies with the understandings specified in

this agreement, no testimony or other information given by him (or any other information directly or indirectly derived from such testimony or other information) will be used against him in any prosecution for criminal tax violations not described above. This Agreement does not provide any protection against prosecution for any crimes except as set forth above.

The understandings are that Steven Hoffenberg shall *truthfully disclose* all information with respect to the activities of himself and others concerning all matters about which the Offices inquire of him, *shall cooperate fully* with the Offices, the Securities and Exchange Commission, the Federal Bureau of Investigation, the Internal Revenue Service, the United States Postal Inspection Service and any other law enforcement agency so designated by the Offices, shall attend all meetings at which his presence is requested with respect to the matters about which the Offices inquire of him, and further, shall truthfully testify before the grand jury and/or at any trial or other court proceeding with respect to any matters about which the Offices may request his testimony. Any assistance Steven Hoffenberg may provide to federal criminal investigators shall be pursuant to the specific instructions and control of the Offices and those investigators. This obligation of truthful disclosure includes an obligation upon Steven Hoffenberg to provide to the Offices, upon request, any document, record or other tangible evidence relating to matters about which the Offices or any designated law enforcement agency inquires of him.

\* \* \* \* \* \*

It is further understood that the sentence to be imposed upon Steven Hoffenberg is within the sole discretion of the sentencing judge. The Offices cannot and do not make any promise or representation as to what sentence Steven Hoffenberg will receive, nor will they recommend any specific sentence to the sentencing judge. However, the Offices will inform the sentencing judge and the Probation Department of: (i) this Agreement; (ii) the nature and extent of Steven Hoffenberg's activities with respect to this case; and (iii) the full nature and extent of Steven Hoffenberg's cooperation with the Offices and the date when such cooperation commenced. In addition, if it is determined by the Offices that Steven Hoffenberg has provided substantial assistance in an investigation or prosecution, and if Steven Hoffenberg has otherwise complied with the terms of this Agreement, the Offices will file a motion, pursuant to Section 5K1.1 of the Sentencing guidelines, advising the sentencing judge of all relevant facts pertaining to that determination and requesting the Court to sentence Steven Hoffenberg in light of the factors set forth in Section 5K1.1(a)(1)–(5).

\* \* \* \* \* \*

It is further understood that Steven Hoffenberg must at all times give *complete, truthful, and accurate information* and testimony and must not commit any further crimes whatsoever. Should Steven Hoffenberg commit any further crimes or should it be determined that he has *given false, incomplete, or misleading testimony or information,* or should he otherwise violate any provisions of this Agreement, Steven Hoffenberg shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, perjury and obstruction of justice. (emphasis added).

### The Cooperation

During the period from March 1993 to February 1994 Hoffenberg responded to all inquiries put to him by the Government concerning the affairs of Towers. He was interrogated principally by Assistant United States Attorney Daniel A. Nardello ("Nardello") who was responsible for the criminal investigation surrounding the affairs of Towers. He also testified before the grand jury on January 13 and 14, 1994 and at the Government's direction engaged in recorded conversation.

The Government does not contend that Hoffenberg failed to perform the agreement by refusing to give information with respect

to Towers or to perform requested acts. However, during the latter quarter of 1993 and the early part of 1994, agents of the SEC advised the United States Attorney's Office that Hoffenberg was not complying with the Consent Order of February 17, 1993, but rather that he made statements and representations which were false in·connection with ongoing matters involving the Consent Order and thereby violated the Agreement.

### The Representations

Throughout 1993 the Government remained concerned about Hoffenberg's compliance with the Consent Order entered in the SEC Action which had required Hoffenberg to provide an accounting of all his assets. Of particular concern was Hoffenberg's involvement with Diversified Credit Corporation ("DCC"), another collections corporation which Hoffenberg set up prior to the termination of his relationship with Towers. DCC was to do business in a manner similar to that conducted by Towers. A second area of concern relating to the Consent Order related to certain payments made to Hoffenberg and finally his relationship to Stratford Credit Corporation ("Stratford") which was started in December 1993.

#### a. DCC

Following his termination from Towers, Hoffenberg represented that his involvement in DCC was limited to "sales consultant," that he was only involved in DCC's sales in its New York office and had no involvement in DCC's collections or operations which were conducted in its Long Island office, nor any real influence over DCC's independent president, Lawrence Lowy ("Lowy").

These representations were significant. In a collection business, such as had been conducted by DCC or its predecessor Towers, the operations side controlled the money collected on behalf of clients. According to the SEC and the Government, certain of the fraudulent activity at Towers centered around the failure of operations employees, at the direction of Hoffenberg and his coconspirators, to remit funds to Towers' clients. By the representation of separation from the collections side of DCC, Hoffenberg gave assurances that (1) he would not de-

fraud DCC collections clients as he had done at Towers, and (2) DCC would not be used as a vehicle to violate the Consent Order.

In June 1993, Hoffenberg told Nardello that he was not receiving any money from DCC. At a proffer session on August 25, 1993, Nardello again confronted Hoffenberg with concerns that his role at DCC was greater than he had revealed. As of August 25, 1993, the SEC had provided Nardello with a list of questions and allegations to use in confronting Hoffenberg on the issue of whether DCC fell within the Consent Order with respect to assets. In addition, on August 25, 1993, the SEC faxed to Nardello a summary of allegations concerning the issue of Hoffenberg's control of DCC. That summary included allegations (1) that Hoffenberg provided funding for DCC, a fact that Hoffenberg had already told the Government, and (2) that Hoffenberg made decisions at DCC. The allegations about Hoffenberg's decision-making at DCC came from an officer of DCC who worked in the Midwest who stated that (1) he and Hughes reported to Hoffenberg, (2) at a meeting on Hoffenberg's boat, Hoffenberg said he owned DCC and had put his money into it, and (3) Hoffenberg represented himself to DCC's clients as the decision-maker.

At that proffer session on August 25, 1993, when Nardello confronted Hoffenberg with his concerns that Hoffenberg's role was greater than he had revealed, Hoffenberg admitted that DCC had been paying for his chauffeur, his maids, and his boat captain, but denied any greater involvement in the company than what he had already revealed. He insisted that he was not involved in collections or operations. Hoffenberg stated at this meeting that he held preferred, nonvoting stock in DCC and therefore could not make the financial decisions. He acknowledged his desire to protect his substantial investment and his hope that, if DCC were successful, he could ultimately reach an agreement with the SEC allowing him to earn money from DCC. Nardello told Hoffenberg that his use of DCC to pay his expenses constituted a violation of the Consent Order, that it would have to be disclosed to the SEC, and that it would have to "stop

immediately." Hoffenberg's admission that he had violated the Consent Order with specific payments supported the Government's view that Hoffenberg then understood his obligations under the Agreement. Nardello agreed to execute the Agreement with Hoffenberg one month later after obtaining Hoffenberg's assurances that he understood his obligations under the Agreement, that he would thereafter walk the straight and narrow, and that he had disclosed all his bad acts.

Hoffenberg maintained throughout his meetings with Nardello that Lowy was "running" DCC, that Lowy was independent, and that Hoffenberg could not influence Lowy's decisions. When DCC went out of business in or about January 1994, Hoffenberg stated that Lowy had "run it into the ground." Hoffenberg stated that when he had met with Lowy in connection with the latter's testimony he had done so only to refresh Lowy's recollection.

On January 27, 1994, when confronted with information indicating his representations relating to DCC were false, Hoffenberg told Nardello that his attorneys at Anderson, Kill, Olick & Oshinsky ("Anderson Kill") had built a figurative "Chinese Wall" between him and Lowy at the Long Island office to ensure that Hoffenberg would remain uninvolved with collections.

### b. Stratford

Nardello was concerned about the potential impact of any new business venture on Hoffenberg's utility as a witness and cooperator. His compliance with the Consent order, as the Government saw it, required that any new business venture had to be cleared with the SEC in order to ensure that such venture did not violate the Consent Order and that Hoffenberg was not positioning himself to revert to the criminal practices he had purported to leave behind. Consequently, Nardello instructed Hoffenberg that he notify the Government of any contemplated business venture. In October 1993, Nardello gave this specific instruction and Hoffenberg agreed.

In December 1993, as DCC became insolvent, Hoffenberg started a new collections company, Stratford Credit Corporation. Hoffenberg did not advise Nardello that he had started Stratford.

On December 22, 1993 Nardello asked Hoffenberg what businesses in which he was participating or had an interest. Hoffenberg stated Her New York and Haley Capital and omitted any mention of Stratford.

When questioned point blank about Stratford, Hoffenberg stated that he had been "approached by others" to join Stratford, which he characterized as an ongoing business, formed by some ex-Towers employees, and that nothing had come of it. Nardello instructed Hoffenberg not to take any further action in Stratford until the matter could be considered further.

### The Falsity of the Representations

Throughout 1993 the SEC had continued its investigation into Hoffenberg's compliance with the Consent Order. At the same time the United States Attorney's Office continued its investigation into the affairs of Towers. Meanwhile, Towers had filed a petition in bankruptcy, a Trustee had been appointed, and he too conducted hearings related to Towers' assets. As a consequence of these investigations, the misrepresentations of Hoffenberg were discovered.

### a. DCC

In May 1993, Hoffenberg was advised by one of his counsel, Martin Brecker of Anderson Kill that in order to avoid the terms of the Consent Order with respect to DCC, Hoffenberg needed to establish that, notwithstanding the legalities, Hoffenberg did not, in fact, control DCC. Further, in order to avoid losing DCC to the Towers Trustee in bankruptcy, Hoffenberg needed to show that he was not using DCC for his own benefit to the detriment of DCC.

Hoffenberg instructed employees at the Long Island office to tell the public that he was just a consultant and that his only office was in New York. However, Hoffenberg closely supervised DCC's collections activities at the Long Island office. Regina Loveless ("Loveless") was an employee in the Long Island office from March 1993 through

the middle of October 1993. She testified that beginning in May and continuing until she left DCC, Hoffenberg was actively involved in the supervision of the office's collections activities. According to Loveless, although Lowy was running the Long Island office while Towers was still in business, beginning in May 1993, it seemed "like there was a higher management above Larry and Brian [Lowy]."

During his first meeting with Loveless, Hoffenberg discussed with her "strategy and tactics" for the accounts assigned to her, instructed her to be more aggressive with debtors and to refer more cases to litigation, and to obtain the litigation fees from the DCC creditors, and directed her to provide him with a weekly status report on all cases referred to the legal department. In June 1993, Hoffenberg installed his longtime confidante Michael Rosoff as the head of the DCC legal department. Hoffenberg told Loveless that whenever she needed to discuss a collections matter and could not reach Rosoff, she should call Hoffenberg. But for any settlement over $50,000, Hoffenberg instructed Loveless to confer with him, whether or not Rosoff was available. Hoffenberg also instructed Loveless not to discuss settlements with clients.

From May 1993 until her departure in October 1993, Loveless spoke with Hoffenberg over the telephone about her cases three to four times per month. Hoffenberg also visited the Long Island office once or twice per week for several hours a visit. During those visits, Hoffenberg regularly met with John Hannon, the manager of the collections staff, and would conduct detailed debriefings of Hannon regarding the status of collections. If any large collection matter was pending, Hoffenberg would go directly to the collector assigned to the account and obtain detailed information. During his visits, Hoffenberg would walk around the office asking collectors "how much did you collect for me today?"

Beginning in May 1993, the same time that Hoffenberg became involved with operations at the Long Island office, Loveless was instructed at least once a month by Sidney Friedfertieg, the manager of customer service, "not to tell the clients about any payments we received." Friedfertieg told Loveless to lie to clients inquiring about their money by telling them that "the computer was down." When Loveless asked why she should conduct business this way, Friedfertieg responded that it was what Hoffenberg wanted. In addition, Hoffenberg was present when Lowy instructed Loveless not to insert in DCC's computer records DCC's collection of more than $100,000 for Loew's Hotel Corporation.

According to Lowy, soon after Hoffenberg was discharged by the Towers bankruptcy Trustee in April 1993, and continuing until the fall of 1993,

> He [Hoffenberg] wanted to know the amount of collections everyday, he wanted to know what the deposits were everyday. He came out usually once or twice a week at that time and took payroll registers and sometimes the registers in the checkbook to see what was being deposited.

Lowy further testified that in approximately August 1993, Hoffenberg replaced him as head of the Long Island office with Charles Chugerman ("Chugerman"), an associate of Hoffenberg at Towers. Thereafter, Chugerman supervised Loveless's accounts, and told Loveless that she should call Hoffenberg on any matter whenever she could not reach Chugerman or Rosoff.

Martin Brecker never mentioned to Hoffenberg the term "Chinese Wall."

Lowy was not independent but was dominated by Hoffenberg. Lowy had worked for Hoffenberg for years and owed essentially his entire career to Hoffenberg.

Hoffenberg controlled Lowy's activities at DCC from small management decisions, such as changing the name of Frederick Lawrence Associates to DCC, to hiring employees.

In April 1993, Hoffenberg "basically took over the company," according to Lowy, and thereafter Lowy reported to him on nearly every detail of DCC's business. When a group of Towers employees indicated that they did not want to work at DCC if it meant working for Lowy, Hoffenberg assured them that they would be working for him. Beginning in May 1993, the ultimate authority to

whom DCC collectors in the Long Island office were supposed to report was Hoffenberg, not Lowy. When Lowy complained to Hoffenberg about the burgeoning payroll in the spring of 1993, Hoffenberg rebuffed him by saying it was his company. When Hoffenberg needed employees for Her New York, he took them from DCC. When Hoffenberg felt it appropriate to oust Lowy as a supervisor in the Long Island office, he did so, and installed Chugerman.

Lowy retained Alan Fraade for DCC's corporate work. Fraade had a longstanding relationship with Hoffenberg and was described as Hoffenberg's "house counsel" at Towers. Hoffenberg selected and discharged lawyers to defend Lowy's deposition before the SEC. When Lowy spoke with Frank Wohl about the nature of his representation of Lowy, Hoffenberg instructed Lowy never to speak with a lawyer outside his presence, and discharged Wohl. Lowy accepted Brecker's representation, who had been selected by Hoffenberg, notwithstanding his knowledge that Brecker had a preexisting relationship with Hoffenberg, and that if a conflict arose, Brecker would represent Hoffenberg. Thereafter, Hoffenberg frequently discussed with Brecker the status of Brecker's representation of Lowy, including whether Lowy should refuse to testify based on his Fifth Amendment privilege. Hoffenberg also involved his long-time associate and counsel Michael Rosoff into Lowy's representation.

Hoffenberg also extracted money from DCC in ways not revealed to Nardello. Hoffenberg obtained blank checks from DCC, which he used for his own personal benefit, which was not disclosed until January 27, 1994, when he was again confronted by Nardello and told that the Government was contemplating the repudiation of the Agreement. Hoffenberg also arranged for DCC to pay certain of his personal American Express bills. Additionally, Hoffenberg obtained free labor at DCC's expense by using several employees on DCC's payroll to do the work of his publication, Her New York. This information was admitted by Hoffenberg at his February 14, 1994 session.

Hoffenberg had met with Lowy in May 1993 and knew that meeting with a witness to influence his future testimony was criminal conduct. Hoffenberg knew that Lowy's truthful testimony regarding their activities at DCC would be harmful to his litigation position and therefore told Lowy what to say.

In the spring of 1993, before Lowy had any relationship with the Government, Lowy told Loveless that he had an illicit agreement with Hoffenberg to mischaracterize Hoffenberg's status at DCC. Lowy stated, in substance, that because Hoffenberg had taken care of him in the past, Lowy would now take care of Hoffenberg by characterizing him to the public as just a DCC consultant.

Lowy and Joseph Hughes ("Hughes") testified falsely before the Towers' Trustee in bankruptcy. Each, at Hoffenberg's behest, minimized the appearance of Hoffenberg's control of, and role in, DCC. At his SEC deposition on May 26, Lowy testified as to Hoffenberg's role as a sales consultant. Lowy testified on September 28 before the bankruptcy trustee that Frederick Lawrence Associates was a successful business doing "several million dollars a year in gross sales" before it became DCC, that Hoffenberg had no control over the disposition of Diversified Holding's funds, that those funds were solely within Lowy's control, that Lowy ran DCC, and that Lowy had no substantive discussion with Hoffenberg about his deposition testimony.

Hughes testified that Lowy ran the New York office of DCC, that Hoffenberg did not have an office at DCC, and that Hughes had not spoken to Hoffenberg about his deposition.

Hughes and Lowy had previously made false statements and covered up for Hoffenberg. During the 1980's, when Hoffenberg's business, Westwood Paper and Hardware, was in bankruptcy, Lowy obeyed Hoffenberg's instructions to destroy the company's books and records. In 1992, when Towers was in litigation with Dunn & Bradstreet, Hughes followed Hoffenberg's and Rosoff's instructions to perjure himself in deposition testimony and affidavits.

Hughes testified that Hoffenberg influenced his testimony and that during early 1994, Hoffenberg and Rosoff arranged for him and two others to sign affidavits falsely characterizing the respective roles of Hoffenberg and Lowy at DCC and that in the period from April to July 1993 he met with Hoffenberg and gave false testimony in a deposition before the trustee in Bankruptcy, at Hoffenberg's behest regarding the management of DCC, including the party line that he (Hoffenberg) was merely a consultant, and that his January 4, 1994 affidavit was prepared by Rosoff and that the affidavit was false. On January 5, 1994, Hughes swore to a false affidavit which characterized his activities at DCC in sales as being supervised by Lowy and later by Chugerman.

Hughes testified in this proceeding that he had in fact reported to Hoffenberg, contrary to his affidavit of January 4, 1994 which he had signed at Hoffenberg's request

### b. *Stratford*

By November 1993, Chugerman had closed the DCC sales offices and terminated much of the sales force. Notwithstanding, remittances were not being made to the DCC clients, which resulted in a state investigation and indictment to which Lowy pled guilty. He also pled guilty under a cooperation agreement to charges of obstructing the SEC and bankruptcy investigation.

Both Lowy and Hughes demonstrated a willingness to falsify testimony but their testimony concerning Hoffenberg's influence on their testimony is confirmed by Loveless and by Hoffenberg's admission that he met with Lowy before the latter testified. On this issue the balance of credibility tilts in favor of Lowy and Hughes.

Hoffenberg started Stratford in early December 1993 without first notifying the Government. In approximately November 1993, one month after Hoffenberg had signed the Agreement, Hoffenberg called Hughes into a meeting with Rosoff and stated that he was starting a new collections business. Hoffenberg further indicated his desire to move quickly with this new collections business by asking Rosoff "[w]here is it faster to incorporate, New York or Delaware?" Hoffenberg

selected Hughes as president. When Hughes declined the appointment, Hoffenberg stated, "[y]eah, I guess you're right, you have too much baggage."

Hoffenberg then selected Steven Dryfus ("Dryfus") to run the new company. Dryfus had previously worked for Hoffenberg at Towers and was now working for Hoffenberg at Haley Capital, which was located in the Trump Tower. In late December 1993, Hoffenberg took Dryfus into the hallway where he could not be overheard and asked Dryfus to be the executive of his new collections company. That company, which Hoffenberg had by then incorporated, was Stratford. Hoffenberg made Dryfus president of Stratford, and Gene Sherman ("Sherman"), Hoffenberg's uncle, vice-president. At DCC, Sherman had blank checks available for Hoffenberg and put up the money to start Her New York and had made payments on Hoffenberg's apartment and boat mortgage. Stratford started operations in late December 1993 by taking on a few collections claims.

Hoffenberg instructed Dryfus in early January 1994 to mischaracterize Hoffenberg's participation in Stratford as minimal. Hoffenberg preferred the appearance of having "no role" in Stratford, but because Hoffenberg was physically present in Stratford's office every day, he took on the title of consultant, as he had at DCC. As Dryfus put it, "that was the spin. He was not a principal with the firm, but he was working as a consultant." In accordance with Hoffenberg's instructions, Dryfus told a Wall Street Journal reporter in January 1994 that he, not Hoffenberg, was running Stratford. Hoffenberg instructed Dryfus to tell counsel that Hoffenberg was just a consultant and that Dryfus was in business with members of Hoffenberg's family. Dryfus followed Hoffenberg's instructions.

In January and February 1994, Hoffenberg spoke with Dryfus "every day" about Stratford's business. He kept track of how much money Stratford was collecting, performed weekly audits of the company, supervised the collectors, and kept apprised of, and signed off on the company's business

development. Hoffenberg funded the business by infusing approximately $50,000 in cash during late January and early February. Dryfus testified that all of this occurred before the Government's February 17, 1994 announcement of the termination of Hoffenberg's cooperation.

Hoffenberg's infusion of cash into Stratford in January and February 1994 further violated the Consent Order and Nardello's instructions. The business was operated by avoiding the use of checks and resorting to cash deliveries.

Dryfus testified that Hoffenberg gave him $24,000 in cash from an accordion folder, that he and Hoffenberg counted the money in a storage room after the other employees left for the day, and that Dryfus then took the money home and at Hoffenberg's direction, used it to pay Stratford's bills.

Approximately three to five days later, Hoffenberg gave Dryfus a sealed, unaddressed, Federal Express package containing $26,000 in cash. Dryfus also used these funds to pay Stratford's bills, including Hoffenberg's $250 per month parking expenses.

In his affidavit of November 28, 1994, in this proceeding, Hoffenberg admitted that he "disregarded [Nardello's] instructions to avoid any involvement with that business." He related how difficult it was for him, even months after he signed the Agreement, to break the habit of conducting business dishonestly.

### The Performance of the Agreement

As set forth above, there is no evidence in this record that Hoffenberg failed to perform his agreement with respect to the affairs of Towers. It is his failure to perform the Agreement with respect to his own affairs in 1993 that is at issue.

The Government also acted in conformity with the Agreement throughout 1993 from September 24 when the Agreement was entered into until December 22, there were no inquiries to Hoffenberg concerning DCC or Stratford.

However, the SEC had continued its investigation which produced certain of the facts set forth above which were confirmed by Lowy, Hughes and Dryfus. Lowy's cooperation began in November, and he was interviewed by an Assistant United States Attorney on December 22. Hughes recounted his recollection of events to James Nauwens, an investigator of the United States Attorney's Office on December 27, 1993.

Nardello was on vacation and upon his return on January 10, 1994, he arranged to have Hoffenberg testify before the grand jury on January 14, 1994. He did not obtain Nauwens' information nor learn of Lowy's cooperation until after Hoffenberg's grand jury appearance.

The Government thus called upon Hoffenberg to perform the Agreement with knowledge in its possession that Hoffenberg had lied about DCC and Stratford and after it had procured statements from Hughes and Lowy on the subject. When Nardello learned of Lowy's and Hughes' cooperation, he challenged Hoffenberg on January 24, and Hoffenberg conceded certain of the information relating to his involvement in Stratford and sought to "cure" his conduct. Nardello met with Hoffenberg again on January 27 and February 14, and recommended that the Agreement be terminated. Hoffenberg was arrested on February 17.

### Discussion

### The Government in Refusing to Perform the Agreement Acted in Good Faith

■ A party who materially breaches a cooperation or plea agreement may not claim its benefits. *United States v. Merritt*, 988 F.2d 1298, 1313 (2d Cir.), *cert. denied* —— U.S. ——, 113 S.Ct. 2933, 124 L.Ed.2d 683 (1993); *United States v. Tilley*, 964 F.2d 66, 70 (1st Cir.1992) (if defendant fails to fulfill his or her promises, the Government is released from its obligations under the agreement); *United States v. Gonzalez–Sanchez*, 825 F.2d 572, 578 (1st Cir.), *cert. denied*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987).

■ At post-conviction hearings, the Government has the burden to prove breach of a plea agreement by a preponderance of the evidence. *United States v. Verrusio*, 803 F.2d 885, 894 (7th Cir.1986) (Government "must prove that the defendant breached the

plea bargain by a preponderance of the evidence"); *United States v. Tilley*, 964 F.2d at 71. Such a standard is consistent with the standard of proof courts have required to resolve other post-conviction disputes, such as disputed sentencing issues. *United States v. Guerra*, 888 F.2d 247, 251 (2d Cir.1989), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990); *see United States v. Merritt*, 988 F.2d at 1313.

Hoffenberg suggests that *United States v. Leonard*, 50 F.3d 1152, 1158 (2d Cir.1995), suggests a higher standard of proof. In *Leonard*, the Second Circuit instructed that "the district court should consider any evidence with a significant degree of probative value, and should rest its finding on evidence that provides a basis for [appellate] review." *Leonard*, 50 F.3d at 1157. A requirement that evidence have a significant degree of probative value is not equivalent to the enunciation of an enhanced standard of proof. It is similar to the requirement described by the Guidelines for resolution of disputed sentencing issues, clearly governed by a preponderance of the evidence standard. Guidelines, § 6A1.3. ("[T]he court may consider relevant evidence without regard to its admissibility ... provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Hoffenberg has also cited *United States v. Martin*, 25 F.3d 211, 217 (4th Cir.1994). There, at the time of sentence, the Government announced that it would make a motion, pursuant to Fed.R.Crim.P. 35(b) within the year because the defendant had cooperated fully before sentence, but it was hoped that he would provide additional cooperation following sentence. Technically, there was no mechanism for the Court to provide post-sentencing relief for the pre-sentencing cooperation. The Court of Appeals held that the Government's failure to make the motion at sentencing resulted in a deprivation of the defendant's due process rights, and remanded for resentencing. In *Martin*, there were no disputed issues, leaving nothing to be resolved in any hearing. It is undisputed that *Martin* reiterated the Circuit's position that the burden of proving a breach is on the party that alleges the breach.

■ Courts have generally looked to the terms of the agreement itself and to the parties' anticipated benefits to determine whether a material breach has occurred. *See, e.g., United States v. Crawford*, 20 F.3d 933, 934–35 (8th Cir.1994); *United States v. Tilley*, 964 F.2d at 71; *United States v. Wood*, 780 F.2d 929, 931 (11th Cir.1986), *cert. denied*, 479 U.S. 824, 107 S.Ct. 97, 93 L.Ed.2d 48 (1986). Where, as here, a defendant has promised to disclose truthfully all information about which the Government inquires, any false statement, misleading statement, or omission concerning the defendant's activity or an area about which the Government has inquired, is a material breach of the agreement.

■ By the terms of the Agreement, Hoffenberg was obligated to "truthfully disclose all information with respect to the activities of himself and others concerning all matters about which the Offices inquire of him" to "cooperate fully with the Offices, the Securities and Exchange Commission ..." and that Hoffenberg "must at all times give complete, truthful, and accurate information" and "must not commit any further crimes." Authorities dealing with similar breaches include *United States v. Crawford*, 20 F.3d at 934–35 (in non-prosecution agreement, defendant agreed to provide complete and truthful cooperation; Government justified in holding defendant in breach where Government dubious about defendant's reliability after he implicated co-defendant in interview with agents, but admitted sole responsibility for crime in conversations with others); *United States v. Gerant*, 995 F.2d 505, 507–08 (4th Cir.1993). When defendant agreed to cooperate fully and provided substantial information about drug operations, defendant breached agreement by lying about his role in two deals, amount of money he earned, and status as Government informant); *United States v. Tilley*, 964 F.2d at 71 (defendant agreed to testify fully, honestly, truthfully and completely; defendant breached agreement by false testimony as to his additional involvement in drug deal); *United States v. Britt*, 917 F.2d 353, 355–56, 360–61 (8th Cir. 1990) (defendant agreed to fully and completely cooperate with the United States and,

over the course of a year, had several debriefings, recorded phone conversations, participated in controlled buy; defendant breached agreement by not disclosing the full extent of his drug dealing), *cert. denied,* 498 U.S. 1090, 111 S.Ct. 971, 112 L.Ed.2d 1057 (1991); *United States v. Gonzalez–Sanchez,* 825 F.2d at 579; *United States v. Wood,* 780 F.2d at 931; *United States v. Patrick,* 823 F.Supp. 583 (N.D.Ill.1993). *See also United States v. Hon,* 17 F.3d 21, 24–26 (2d Cir.1994) (upholding Government's refusal to file 5K1 letter for cooperator who delayed his testimony, thereby breaching his obligation to "fully cooperate").

As found above, from the beginning of his proffer sessions in April 1993 through his final meeting on February 14, 1994, Hoffenberg lied to the Government about his involvement in the operation of DCC, about Lowy's "independence" as president of the company, and failed to disclose his involvement in Stratford.

According to Hoffenberg, because the Government did not focus his attention on DCC until meetings in late January 1994, his failure to describe accurately his role at DCC was not a breach. Before he entered into the Agreement, however, Hoffenberg had been fully and pointedly questioned specifically about DCC, his role in the company, and whether he was receiving any payments from the company. Although the Government relied on his representations, Hoffenberg misled the Government when questioned.

Hoffenberg argues that whether or not he "controlled" DCC is a legal question, not a factual one, and therefore his assertion cannot be a lie or a breach of the Agreement. However, Hoffenberg misled the Government about specific facts relevant to his role at DCC. Each misleading statement, omission, and lie was itself a breach, apart from his general assertion that he did not "control" DCC.

That the Government did not specifically ask about DCC at additional meetings prior to January 1994 is no excuse for Hoffenberg's failure to provide the information, and correct the prior misleading statements he had already made. *See United States v.*

*Wood,* 780 F.2d at 930 (defendant's failure to disclose information about a drug deal in Jacksonville, although only questioned about drug dealing in Tampa, was a material breach of the obligation to truthfully disclose all information about drug dealing).

When confronted by Nardello on December 22, 1993, Hoffenberg acknowledged that he had lied to the Government about even contemplating participation in Stratford. Although this caused concern, the Government, in its discretion, did not end the Agreement based on that lie alone. What followed, and what the Government later learned, was that Hoffenberg misled the Government about his interest and participation in Stratford, the cash payments to Stratford, and, of course, that he had violated his promise to Nardello pursuant to the Agreement not to get involved in Stratford.

■ Hoffenberg argues, however, that he cured this breach by admitting his lies. Although the "opportunity to cure" doctrine applies comfortably to contracts for the delivery of goods, it does not apply to cooperation agreements. As the Second Circuit has stated, "[c]omparing a criminal defendant to a merchant in the marketplace is an inappropriate analogy that we have rejected." *Innes v. Dalsheim,* 864 F.2d 974, 978 (2d Cir.1988), *cert. denied,* 493 U.S. 809, 110 S.Ct. 50, 107 L.Ed.2d 19 (1989). *See United States v. Khan,* 920 F.2d 1100, 1105 (2d Cir.1990) ("We recognize, of course, that criminal sentencing proceedings are not the same as civil contract disputes."), *cert. denied,* 499 U.S. 969, 111 S.Ct. 1606, 113 L.Ed.2d 669 (1991). While the differences between contracts in the civil and criminal contexts often focus on the "meticulous standards [which must be] ... met by the prosecutors ...," *U.S. v. Mozer,* 828 F.Supp. 208, 215–216 (S.D.N.Y.1993) (citations omitted), the differences apply to the defendants as well. The very purpose of a cooperation agreement is to obtain full and truthful information from a cooperator on each and every topic about which the Government inquires. While the Government gave Hoffenberg opportunities to be truthful, it was not incumbent on the Government to continue to extend to Hoffenberg such an opportunity.

When the Government determined in February that Hoffenberg had not been truthful, as required in the Agreement, it was within its right to declare the breach.

■ Although Hoffenberg could not "cure" the fact that he lied to and misled the Government in violation of the Agreement, he was given ample opportunity to confront the allegations and provide an innocent explanation. Such an opportunity is all that is required. In *United States v. Crawford*, 20 F.3d at 936, for example, a defendant told the Government one version of a fraud, implicating a co-defendant, and told others that he was solely responsible. It was sufficient that he was asked for names of people who could corroborate the version of events he had given.

Hoffenberg was given numerous opportunities to show the Government that he had not breached the Agreement. Rather than terminate the Agreement once the Government had serious concerns, the Government met with Hoffenberg on January 27 and February 14, 1994, to enable Hoffenberg to address the issues and to assert an innocent explanation for the allegations. With respect to Stratford, Hoffenberg admitted that he had lied to and misled the Government and intentionally violated the Agreement with Nardello.

On the issue of cure, this case can be distinguished from that in *United States v. Brechner*, 93 Cr. 626, Memorandum of Decision and Order, October 19, 1995 (E.D.N.Y.). In *Brechner*, a defendant subjected to a similar truthfulness obligation was asked in a debriefing session whether or not he had received unreported cash from several individuals. The defendant, Brechner, said that he had not. Brechner's lawyer apparently asked to speak to Brechner, and after doing that, Brechner admitted that he had received such payments. After "coming clean," the Government "advised Brechner that he was giving him a 'fresh start' and expected him to answer questions concerning unreported cash truthfully...." The Court found that after this statement, the government asked another hours' worth of questions and that Brechner made full and truthful disclosures of the subject schemes. When five months la-

ter the Government refused to move for a downward departure, the Court found that this was done in bad faith.

In this case, no such promises were made to Hoffenberg at or after the February 14 session. The Government informed Hoffenberg three days later on February 17 that it was not going to move for a downward departure. The Government had not promised that it would go forward with the 5K1 term of the Agreement, nor is there any indication that it used these sessions to get additional information, thus behaving as thought the Agreement was in full force. In fact, there is no indication that the Government is attempting to use affirmatively any of the information gained in those sessions against Hoffenberg. The sessions confirmed suspected lies that he had told earlier and as a result the Government is choosing not to make a 5K1 motion on his behalf.

### The Agreement Allows the Government to Consider Truthfulness When it Determines Whether to Make a 5K1 Motion

■ When a cooperation agreement allows for a substantial assistance motion contingent upon the Government's evaluation of a defendant's cooperation, the Government has wide discretion in determining whether to make such a motion. *United States v. Hon*, 17 F.3d at 25; *see United States v. Khan*, 920 F.2d at 1105 ("where a contract is conditioned on the satisfaction of the obligor, the condition is not met 'if the obligor is honestly, even though unreasonably, dissatisfied' "); *United States v. Knights*, 968 F.2d 1483, 1486 (2d Cir.1992) (Government's performance in cooperation agreement is conditioned on its satisfaction with the defendant's efforts).

■ Where the Government declines to make a substantial assistance motion pursuant to a cooperation agreement, the district court may review the decision only to determine whether the Government based its decision on impermissible criteria, such as race or religion, or whether the Government acted in bad faith. *United States v. Kaye*, 65 F.3d 240, 243 (2d Cir.1995); *United States v. Hon*, 17 F.3d at 25; *United States v. Knights*, 968

F.2d at 1487; *United States v. Agu,* 949 F.2d 63, 67 (2d Cir.1991), *cert. denied,* 504 U.S. 942, 112 S.Ct. 2279, 119 L.Ed.2d 205 (1992); *see United States v. Khan,* 920 F.2d at 1104 ("the prosecutor's discretion is generally the sole determinant of whether the defendant's conduct warrants making the motion"); *United States v. Rexach,* 896 F.2d 710, 714 (2d Cir.) (prosecutorial discretion limited only by subjective good faith standard), *cert. denied,* 498 U.S. 969, 111 S.Ct. 433, 112 L.Ed.2d 417 (1990).

■■■ The Government may not refuse to make a substantial assistance motion by relying on facts which it knew at the time it entered into the agreement. Such a decision would amount to fraudulently inducing a defendant's plea with a promise that the Government already knew it would not keep. *See United States v. Knights,* 968 F.2d at 1488; *United States v. Leonard,* 50 F.3d at 1158. However, where as here, the Government enters into an agreement in good faith, believing the defendant's representations, and the Government subsequently learns that the defendant has lied and breached the terms of the agreement, the Government's dissatisfaction with the defendant's performance is justified.

■■■ When a defendant claims that the Government has acted in bad faith in refusing to move for downward departure, the Government may then rebut the allegation, explaining its reasons for refusing to so move. *United States v. Knights,* 968 F.2d at 1487. A defendant must then make some showing of bad faith to trigger a hearing on the issue. After a full-blown hearing in this case, Hoffenberg has failed to establish any bad faith on the part of the Government.

■■■ The clause of the Agreement regarding the 5K1 states that:

In addition, if it is determined by the Offices that Steven Hoffenberg has provided substantial assistance in an investigation or prosecution, *and if Steven Hoffenberg has otherwise complied with the terms of this Agreement,* the Offices will file a motion, pursuant to Section 5K1.1 of the Sentencing Guidelines, advising the sentencing judge of all relevant facts pertaining to that determination and requesting the Court to sentence Steven Hoffenberg in light of the factors set forth in Section 5K1.1(a)(1)–(5). (emphasis added).

The Government was obligated to move for a departure if Hoffenberg provided substantial assistance and if he "otherwise complied with the terms of [the] Agreement." The Court of Appeals has stated that parties to a plea Agreement could establish terms of the Agreement which were other than standard and to which they would be bound. *See United States v. Rexach,* 896 F.2d 710, 714 (2d Cir.1990) ("... a defendant might negotiate an agreement which, by its terms, would define a different standard for evaluation. Should such a cooperation agreement specify ... [a more stringent standard], then we would, of course, employ [that standard].") In this case the filing of the 5K1 motion was contingent on both substantial assistance and compliance with the terms of the Agreement. The parties were bound to the term as it was written. Hoffenberg did not otherwise comply with all the terms of the Agreement. The Agreement, quoted above, required truthfulness. Hoffenberg was not truthful.

■■■ Even if the Court were to consider the "substantial cooperation" clause in isolation of the rest of the conditions, there has not been a showing of bad faith.[1] It would not be enough for Hoffenberg to prove his substantial assistance, since "a claim that a defendant merely provided substantial assistance will not entitle a defendant to a remedy...." *Wade v. U.S.,* 504 U.S. 181, 186, 112 S.Ct. 1840, 1844, 118 L.Ed.2d 524 (1992). It is reasonable and appropriate for the Government to consider Hoffenberg's truthfulness in evaluating his assistance. It is significant that Hoffenberg repeatedly corrected and changed his story and helped suborn perjury. It was not bad faith to believe that the information Hoffenberg provided was not entirely useful. *See, e.g., United States v. Knights,* 968 F.2d 1483, 1488 (2d Cir.1992).

---

**1.** In evaluating the Government's 5K1 motion, the Court is instructed by the Guidelines to consider the "truthfulness, completeness and relia-

bility" of any information or testimony provided, *See* Guidelines § 5K1.1(a)(2).

The Court of Appeals' admonition in *Knights,* is not relevant in this case. In *Knights,* the Court of Appeals reminded us that while the Government "has wide latitude in evaluating a defendant's cooperation, [t]hat latitude ... does not permit it to ignore a defendant's efforts at cooperation simply because the defendant is providing information that the government does not want to hear." *Id.* In this case it is the veracity of the cooperation and not the content of the cooperation that is at issue.

The Agreement was vitiated only after the Government determined, after a thorough investigation, that Hoffenberg was lying about DCC, as well as about Stratford, that he encouraged the perjury of Hughes and Lowy, and only after Hoffenberg was given ample opportunity to provide an innocent explanation. Hoffenberg cannot now claim that the Government acted in bad faith by accepting and believing his false portrayal of his role at DCC, and entering the Agreement in reliance on that.

Because Nardello called Hoffenberg to testify in the grand jury on January 14, 1994, at a time when there were problems with Hoffenberg's cooperation and when the Government knew of his misrepresentations, Hoffenberg claims that Nardello improperly "sandbagged" Hoffenberg, and thus, acted in bad faith. As Nardello testified, it had been his intention for Hoffenberg to testify in the grand jury since the signing of the Agreement. In fact, in November 1993, Hoffenberg testified before the grand jury in the Northern District of Illinois.

As of January 14, 1994, no decision had been made to terminate Hoffenberg's cooperation agreement. Indeed, the Government did not begin to seriously consider terminating the Agreement until January 18, 1994, when Hoffenberg admitted that he had disregarded Nardello's specific instructions of December 22, 1993, regarding Stratford. As of the grand jury testimony on January 14, 1994, the only breach of which Nardello had personal knowledge was Hoffenberg's failure to mention Stratford when asked about businesses he might be considering entering into at the December 22, 1993 meeting.

Hoffenberg places great emphasis on the fact that both Lowy and Hughes had already met with a Government investigator prior to January 14, 1994, and had made allegations that Hoffenberg suborned perjury. Nardello, however, did not meet with Lowy until January 24, 1994, and with Hughes until January 25, 1994. In large part what Nardello knew when is irrelevant to the determination of good faith on the issue of whether or not the Government must make the substantial assistance, 5K1 motion. The Government has not vitiated the other portions of the plea agreement. It has simply notified Hoffenberg that no 5K1 letter will be forthcoming.

 In the end, it is proper for the Government to consider the truthfulness of a defendant in evaluating the degree of his cooperation. When a cooperator enters into an agreement with the government which includes a provision for a 5K1 motion, that defendant must be honest if he hopes to achieve the benefit of the bargain. The government may permit a defendant to cure his dishonesty, but it is not required to do so and certainly need not do so continuously. Even if the untruths are not central to the cooperation, if the lies are deemed material to the evaluation of the truthfulness, the Government, absent unconstitutional or bad faith motivation, is free not to move for the departure. Hoffenberg's repeated deceptions rendered him untrustworthy as a cooperator. The Government is justified in its actions. There has been no showing of bad faith.

### Conclusion

For the reasons described above, Hoffenberg's motion for specific performance of the Agreement is denied.

It is so ordered.