**UNITED STATES of America,**

v.

**Steven HOFFENBERG, Defendant.**

**No. 94 Cr. 0273 (RWS).**

United States District Court,
S.D. New York.

Oct. 28, 1996.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, for United States of America, by Amy E. Millard, Assistant U.S. Attorney, of counsel.

Daniel Meyers, New York City, for Defendant.

SWEET, District Judge.

Defendant Steven Hoffenberg ("Hoffenberg") has moved to withdraw his guilty plea on the grounds that the allocution failed to meet the standards of Rule 11, Fed. R.Crim.P. For the reasons set forth below, the motion will be denied.

### Prior Proceedings

The parties, prior proceedings and facts of this action are fully set forth in several prior Opinions of the Court, familiarity with which is assumed. *See United States v. Hoffenberg,* 859 F.Supp. 698 (S.D.N.Y.1994); *United States v. Hoffenberg,* 1995 WL 10840 (S.D.N.Y. Jan. 12, 1994); *United States v. Hoffenberg,* 908 F.Supp. 1265 (S.D.N.Y.1995). A brief recital of the background, and a statement of the facts relevant to the instant motion, are presented below.

Prior to 1991, Hoffenberg and a number of corporate entities with which he was associated, including Towers Financial Corporation, Inc. ("Towers"), and others, came under investigation by the Securities & Exchange Commission ("SEC"). The SEC filed an action in this District against Hoffenberg and others on February 8, 1993, and on February 17, 1993, Hoffenberg and certain other defendants agreed to a preliminary injunction issued by the Honorable Whitman Knapp which, among other things, enjoined Hoffenberg and "each of his controlled, related, or

affiliated entities ... to hold and retain within their control, and otherwise prevent any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal of any funds, or other properties."

In 1993, the United States Attorney for the Southern District of New York began a criminal investigation of Hoffenberg and others for conspiracy to obstruct the SEC's investigation during 1991 and 1992, and for various other criminal violations of the securities laws.

In March of 1993, Hoffenberg, through counsel, initiated a number of proffer sessions with the United States Attorney's office which culminated in an oral understanding. Pursuant to that understanding, Hoffenberg agreed to talk to representatives of the United States Attorney's Office for the Southern District of New York and the Northern District of Illinois, the FBI, and the SEC (collectively, the "Government"). In return, the Government agreed to grant Hoffenberg limited immunity. On September 24, 1993, Hoffenberg and the Government entered into a plea agreement, dated September 23, 1993 (the "Agreement"). Discussions with Hoffenberg continued.

The Agreement provided, among other things, that upon performance of the Agreement, Hoffenberg would plead to the four counts specified in the Agreement and the Government would advise the sentencing judge of Hoffenberg's cooperation through the issuance of a letter, pursuant to § 5K1.1 of the Sentencing Guidelines.

On January 27, 1994, and on February 14, 1994, the Government confronted Hoffenberg with allegations that he had violated his obligations under the Agreement. On February 17, Hoffenberg was advised that the Agreement had been terminated, and he was arrested.

On April 19, 1994 Hoffenberg was indicted in the Northern District of Illinois on fraud charges. On April 20, 1994 he was indicted in the Southern District of New York and charged with the four counts contemplated in the Agreement, as well as six additional counts alleging substantive securities fraud violations in connection with the sale of notes and bonds of Towers, additional violations of the mail fraud statute, and obstruction of justice for disobeying an order of the United States District Court for the Southern District of New York.

Following his indictment, Hoffenberg moved for specific enforcement of the Agreement. By opinion dated July 21, 1994, *see United States v. Hoffenberg*, 859 F.Supp. 698 (S.D.N.Y.1994), his motion was denied as premature in the absence of a plea. Hoffenberg then moved to reargue that motion and to suppress the statements he had made in reliance upon the Agreement. The motion for reargument and suppression was denied by an opinion rendered on January 11, 1995, again on the grounds that it was premature.

After the filing of the Indictment against him, the Government nonetheless permitted Hoffenberg to plead to the four counts specified in the Agreement. On April 20, 1995, Hoffenberg entered a guilty plea to four counts: (i) conspiracy to violate the securities laws by fraudulently selling securities; (ii) mail fraud; (iii) conspiracy to obstruct justice; and (iv) tax evasion. It is that plea that Hoffenberg's present motion seeks to set aside.

Beginning on June 5, 1995, and continuing through June 14, 1995, the Court conducted a hearing on Hoffenberg's renewed motion for specific performance of the Agreement. On September 12, 1995, the Court heard oral argument on that motion. On December 18, 1995, this Court issued an opinion denying Hoffenberg's motion and finding that Hoffenberg had breached the Agreement. *Hoffenberg*, 908 F.Supp. 1265.

Following the denial of Hoffenberg's motion, the Court set a sentencing date of March 21, 1996, which was subsequently adjourned several times at Hoffenberg's request. On July 29, 1996, Hoffenberg filed the instant motion to withdraw his plea. Affidavits were submitted and oral argument on the motion was heard on September 27, 1996, at which time the motion was considered fully submitted.

### The Plea Allocution

On April 20, 1995, a plea allocution was conducted. At the start of the allocution, the

Court explained to Hoffenberg that it would seek to ascertain the following issues:

> Whether you are pleading guilty freely and voluntarily.
>
> Leaving aside this colloquy that we've had,[1] whether any promises concerning your sentence have been made to induce you to plead other than what we have talked about.
>
> Whether any threat or force has been used to get you to plead guilty.
>
> Whether you are under the influence of any drugs, pills, narcotics, medicine, anything which would make it difficult for you to understand the nature of the charges and the consequence of your plea.
>
> I'm going to ask you what you understand the charges against you to be and what you did in connection with those charges so I can determine whether there is a factual basis for the plea.

Tr. at 15.

The Court added:

> Before accepting a guilty plea, I expect that you will have discussed all the facts of this case with your lawyer, that he has advised you of the nature of the charges, your rights, the factual basis for your plea, the consequences of your plea and any defense which you might have.

Tr. at 15–16. The Court then summarized the charges against the defendant and the sentencing consequences of a guilty plea to those charges. Tr. at 16–17.

Questioning Hoffenberg directly, the Court then ascertained that Hoffenberg wished to plead guilty to the charges against him, that Hoffenberg had discussed those charges with his lawyer, that Hoffenberg told his lawyer "everything that you know about the matters covered in these accusations," that Hoffenberg believed his lawyer "is fully informed," and that the lawyer had "advised you of your rights and explained the charges to you and discussed with you any possible defenses you might have." Tr. at 18–19.

The Court then ensured that no threats or secret promises had been made to induce the plea:

> THE COURT: Has your lawyer or the Assistant United States Attorney or any government agent or anybody else made any promise to you that you would be treated leniently or any other kind of promise to induce you to plead guilty other than the matters which we have already discussed?
>
> THE DEFENDANT: No, Your Honor.
>
> THE COURT: Has any threat or force been used against you?
>
> THE DEFENDANT: No.

Tr. at 20–21.

After directly questioning Hoffenberg about his residence, household, education, and employment, and listening to his responses, the Court inquired whether Hoffenberg had used any kind of drug that would have affected his ability to understand the plea proceeding. The Court asked:

> In the last twenty-four hours, have you used any drugs, pills, narcotics, anything that would affect your ability to understand these proceedings?

Tr. at 22.

Hoffenberg responded, "No, Your Honor." Tr. at 22. The Court then asked Hoffenberg whether he was under a doctor's care, and Hoffenberg responded that he was. The Court then asked, "And for what?" Tr. at 22. Hoffenberg responded, "For anxiety." Tr. at 22. The Court then asked Hoffenberg if, in the course of treatment, he was receiving any drugs. When Hoffenberg responded that he was, the Court once again asked if Hoffenberg had taken any drugs in the last 24 hours. For a second time, Hoffenberg said no. Tr. at 22. The Court then asked Hoffenberg if he was satisfied with his lawyer. Hoffenberg responded, "Yes." Tr. at 22.

The Court then questioned Hoffenberg about the charges to which he was pleading guilty. Hoffenberg, in his own words, explained to the Court the rather complex set

---

1. The court was referring to a lengthy colloquy regarding Hoffenberg's attempt to enforce the plea agreement he had signed with the Govern-

ment, in spite of the Government's position that he had violated that agreement and therefore would not receive the benefit of a 5K letter.

of facts which were the basis for count one, the charge of conspiracy to commit securities fraud. He stated:

> At Towers Financial, there were three outside accounting firms that issue financial statements that I was aware of, that I was part of. These financial statements were prepared by an accounting firm named Marvin Basson, Richard Eisner & Company, a New York firm, and Price Waterhouse, not of the United States but Price Waterhouse of Barbados, which is separated from Price Waterhouse in the United States, it is a separate firm. These particular firms issued false financial statements where they inflated, with the cooperation of the Towers people and myself, my involvement, the assets of Towers Financial Corporation. They were inaccurate and were used in order to sell bonds and notes and debentures.
>
> THE COURT: And you knew of this inaccuracy at the time?
>
> THE DEFENDANT: Yes, Your Honor.

Tr. at 24.

Hoffenberg's lawyer explained count two, the mail fraud count, which was based essentially on the same set of facts as the conspiracy to commit securities fraud count. Hoffenberg's lawyer stated:

> [W]ith Mr. Hoffenberg's knowledge and active participation, the Towers annual reports for the years 1988 through 1992 contained many of these fraudulent financial statements and were sent through the mails.

Tr. at 24–25.

Hoffenberg then acknowledged that he was not only aware of the fraudulent Towers scheme, but also participated in it. Tr. at 25. Hoffenberg, when asked whether he knew that the financial statements overstated the assets and revenues of Towers, and that the prospectuses mailed to investors included those financial statements and also misrepresented how the proceeds of the notes and bond sales were going to be used by Towers, responded "Yes, Your Honor." Tr. at 28–29.

As to count three, conspiracy to obstruct justice in connection with an SEC investigation, Hoffenberg once again explained his actions in his own words and responded to questions put to him by the Court:

> THE DEFENDANT: The individuals at the company that participated in the preparation of the accounting information were all subpoenaed. There were a number of them that had to appear and explain what their role was and what they did prepare on the accounting statements and what actual work product was their responsibility. I and the attorneys for the company listened to them and interacted with them in what they were going to say to the SEC in order to continue their incorrect and false activities.
>
> THE COURT: Putting it differently, you were aware that they were going to testify falsely before the SEC?
>
> THE DEFENDANT: Yes, Your Honor. I was aware of it. I myself did that and the attorneys for the company did.

Tr. at 25–26.

With respect to count four, the tax evasion count, Hoffenberg again addressed the Court directly: "I had retained an accounting firm of Winneck & Sanders and tax counsel of Bayliss & Poles, and these people received my records from me, sat down with me, and worked up a scheme in order to file, which they filed and I countersigned, as well as they did, incorrect tax returns, and I knew they were incorrect." Tr. at 26.

As to the mail fraud charge based on the events in Chicago, Hoffenberg's lawyer stated:

> The essence of it is that after one of Mr. Hoffenberg's entities ... purchased the insurance companies that were located in Illinois, those companies had certain assets that they had to maintain as part of their balance sheet in order to write insurance, etc. Some of those assets were bonds that the company owned and were supposed to be used only as an asset of the company.
>
> It is alleged and Mr. Hoffenberg is pleading guilty to the fact that he and others removed those bonds from the company, brought them, in part, to New York ... and used them as collateral for trading in various stocks.

Tr. at 26–27.

Hoffenberg's lawyer then asked Hoffenberg to tell the Court what happened. Hoffenberg responded, "What happened is what Mr. Hoffman said actually. That's what took place, exactly what he said." Tr. at 27. The Court then addressed Hoffenberg again and asked, "At the time these events took place, Mr. Hoffenberg, did you know that you were violating the law?" Hoffenberg responded, "Yes, Your Honor." Tr. at 29.

Before concluding the proceeding, the Court addressed both Hoffenberg and his attorney, Jeffrey Hoffman:

> THE COURT: Mr. Hoffman, you have had an opportunity to advise Mr. Hoffenberg of his rights, the nature of the charges and the consequences of his plea?
>
> MR. HOFFMAN: Yes, I have, Your Honor.
>
> THE COURT: Do you know of any promises or threats to induce him to plead other than the matters which had been spread on the record?
>
> MR. HOFFMAN: Not other than the matters that we discussed today.
>
> THE COURT: Do you know of any defense he has or any other reason why he should not plead guilty?
>
> MR. HOFFMAN: I do not.
>
> THE COURT: Are you satisfied that he is pleading guilty freely and voluntarily, with an understanding of the nature of the charges and the consequences, and because he is guilty and for no other reason?
>
> MR. HOFFMAN: Yes, Your Honor.
>
> THE COURT: Mr. Hoffenberg, you have been informed of your rights, the penalties you could receive on sentencing. Do you still wish to plead guilty?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: Are you pleading guilty freely, voluntarily, and solely because you are guilty?

THE DEFENDANT: Yes, Your Honor.

Tr. at 29–30.

Following that colloquy, the Court accepted the plea and set a date for sentencing.

### The Mental State of Hoffenberg

In connection with the instant motion, Hoffenberg and the Government have submitted evidence [2] establishing that Hoffenberg has had a history of mental illnesses dating back to a hospitalization in 1970, which included electroconvulsive therapy, anti-psychotic medications such as thorazine, and the mood stabilizer lithium. He was diagnosed at that time as manic depressive. Another episode of depression occurred in the late 1970's, according to Hoffenberg.

In the 1980's, he first consulted Dr. Eugene Walder, a psychologist ("Dr. Walder"), initially in connection with couples therapy. In 1994, his depression returned, according to Hoffenberg, but he received no further treatment. In March 1995, as the time of his plea approached, he again consulted Dr. Walder, who referred him to Dr. Joel S. Hoffman ("Dr. Hoffman"), a psychiatrist, for medication. On March 16, 1995, Dr. Walder determined that Hoffenberg was suffering from a major depressive episode.

During March and April of 1995, Hoffenberg was taking homeopathic and herbal medication for his depression, as well as prescription medications. On March 24, 1995, Dr. Hoffman prescribed clonazepan (Klonopin), an anti-anxiety medication. On April 7, 1995, Hoffenberg's dosage of Klonopin was increased, and he was prescribed fluoxereine (Prozac), an anti-depressant, as well. Dr. Hoffman on March 24, 1995 found Hoffenberg to be "cognitively intact" and suffering from a Probable Bipolar II Disorder and a Mixed Personality Disorder with a global assessment of functioning of 40 out of a scale of 100. Hoffenberg attests that he was taking Prozac and Klonopin daily for several weeks prior and following to the plea, and that the day of the plea was the only day

---

**2.** The evidence consisted of the transcript of the April 20, 1995 plea allocution, the reports of Drs. Dudley, Drob and Berger, the notes of Drs. Walder and Hoffman, the records of Hoffenberg's hospitalization in 1970 for manic depressive illness, and the Probation Department Investigation Report prepared in connection with Hoffenberg's arrest in 1970.

during that period he did not take those medications.

As indicated in Hoffenberg's medical history, in the days before the plea, Hoffenberg, although depressed, was actively focused on his life, his activities, and his future. Three days before the guilty plea, Hoffenberg called Dr. Hoffman to ask about his insurance and to report that his mood was calmer. The day before the plea, Hoffenberg met with Dr. Walder, his psychologist, and told him that he would plead guilty the following day, that he would be assassinated by the media, and that he was feeling less depressed. Dr. Walder, aware of the next day's proceedings, made no change in the prescribed regimen for Hoffenberg and no recommendation concerning the plea proceeding.

Based on his examination of Hoffenberg on April 1996, Dr. Richard G. Dudley ("Dr. Dudley"), a psychiatrist retained by Hoffenberg, concurred in Dr. Hoffman's prior diagnosis and gave a global assessment rating of 70 and rendered the following opinion:

> It is also the opinion of this psychiatrist that since SH had only recently started psychopharmacologic treatment with Prozac (an antidepressant medication) and since the Prozac dose was still only 5 mg each day (the recommended therapeutic dose is 20 mg each day), the Prozac had not yet resolved his Major Depressive Episode. In addition, SH reported and his medical records confirm that in April 1995 he was being treated with both Prozac and Klonopin; both Prozac and Klonopin can have adverse effects on a person's mental status; and such adverse effects can include impairment of a person's ability to think. Therefore in April 1995, SH's thinking and judgement could have been influenced by both his Major Depressive Episode and one or more of the medications that he was taking.

Dr. Robert Berger ("Dr. Berger"), a psychiatrist retained by the Government, did not agree with the diagnosis of Drs. Hoffman and Dudley. Dr. Berger's assessment was supported by the psychological evaluation conducted by Dr. Sanford Drob ("Dr. Drob"), also retained by the Government.

## Discussion

### I. *The Court's Inquiry Satisfied Rule 11*

Hoffenberg claims that the Court violated Rule 11 of the Federal Rules of Criminal Procedure by failing to inquire, at the plea allocution, about Hoffenberg's mental condition, the medication he was taking for his mental condition, and the effect of that medication on Hoffenberg's decision to plead guilty. Rule 11 provides, in part:

> (c) Advice to Defendant. Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform him of, and determine that he understands, the following:
>
> > (1) the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law, including the effect of any special parole term and, when applicable, that the court may also order the defendant to make restitution to any victim of the offense....
>
> (d) Insuring that the Plea is Voluntary. The court shall not accept a plea of guilty or nolo contendere without first, by addressing the defendant in open court, determining that the plea is voluntary.

In *United States v. Rossillo*, 853 F.2d 1062, 1065 (2d Cir.1988), the Second Circuit Court held that Rule 11 requires the trial court, in order to ensure that a plea is voluntary, to interrogate the defendant personally, and to make an on-the-record determination that any medication the defendant may be taking has not affected his ability to understand the nature of the charges and consequences of his plea. *Rossillo*, 853 F.2d at 1065 (citing *McCarthy v. United States*, 394 U.S. 459, 466–67, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969)). Furthermore, both the Supreme Court and the Second Circuit have held that a plea will not be considered voluntary when a district court "resorts to 'assumptions' not based upon recorded responses to his inquiries." *McCarthy*, 394 U.S. at 467, 89 S.Ct. at 1171; *see also Rossillo*, 853 F.2d at 1065 (Rule 11 violated where district judge "assumed" defendant's medication did

not interfere with defendant's ability to comprehend proceedings).

At Hoffenberg's plea allocution, the Court engaged in the following colloquy with the Defendant:

THE COURT: In the last twenty-four hours, have you used any drugs, pills, narcotics, anything that would affect your ability to understand these proceedings?

THE DEFENDANT: No, your Honor.

THE COURT: Are you under a doctor's care?

THE DEFENDANT: Yes.

THE COURT: And for what?

THE DEFENDANT: For anxiety.

THE COURT: In the course of that treatment, are you receiving any drugs?

THE DEFENDANT: Yes.

THE COURT: And what drug are you receiving? Let me put it this way: Have you taken any drugs in the last twenty-four hours?

THE DEFENDANT: No, your Honor.

Tr. at 22.

Hoffenberg contends that the Court should have probed further as to exactly what medical care Hoffenberg was under, what medication he was being treated with, when he last took the medication, whether the medication affected his mental capacity, and whether his mental condition in any way impaired his ability to enter a plea. The crux of Hoffenberg's argument is that the Court erred in limiting its inquiry to whether Hoffenberg had taken any drugs in the previous 24 hours, rather than pursuing more detailed information about the "anxiety" for which Hoffenberg was under medical treatment, the "drugs" Hoffenberg stated he was taking, and the effects, if any, of those drugs on Hoffenberg's competency to plead guilty.[3] Hoffenberg's contention is that such an inquiry would have revealed that, although Hof-

fenberg had not taken any drugs in the previous 24 hours, the psychotropic medication he was then taking on an ongoing basis—and the mental condition for which that medication was prescribed—required further inquiry.

The *Rossillo* Court held:

if there is any indication ... that defendant is under the influence of any medication, drug or intoxicant, it is incumbent upon the district court to explore on the record defendant's ability to understand the nature and consequences of his decision to plead guilty.

*Id.* at 1066.

*See also United States v. Cole,* 813 F.2d 43, 47 (3d Cir.1987) ("[w]here significant evidence does come to the attention of the district court that defendant has recently taken drugs, the court has the obligation to inquire further").

The Court's inquiry satisfied Rule 11. The Court inquired of Hoffenberg: "In the last twenty-four hours, have you used any drugs, pills, narcotics, anything that would affect your ability to understand these proceedings?" Hoffenberg unequivocally answered no. Upon learning that Hoffenberg was being treated for his anxiety with medication, the Court again inquired whether Hoffenberg had taken any medications in the last twenty-four hours, thereby ensuring that Hoffenberg was not then under the influence of any medication that would affect his ability to plead guilty voluntarily and competently. This inquiry satisfied Rule 11, and cannot be said to violate the Rule.

Moreover, the record here demonstrates that Hoffenberg pleaded guilty voluntarily and with a full understanding of the nature of the charges and the consequences of the plea. Indeed, Hoffenberg does not now allege that, when he pleaded guilty, he was

---

**3.** Hoffenberg also contends that the Court violated Rule 11 by repeatedly permitting defense counsel to answer for the defendant and failing to elicit direct testimony from Mr. Hoffenberg. In support of this argument, Hoffenberg cites *Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969), which held that a silent record cannot satisfy the requirements of Rule 11, and the *Diagnostic and Statisti-*

*cal Manual of Mental Disorders* which states that a careful interview is required to elicit symptoms of a Major Depressive Episode because of the patient's repression of feelings or lack of ability to concentrate. Hoffenberg's argument in this regard is not supported by relevant precedent, nor by the transcript of the allocution, which documents a substantial direct exchange between the Court and Hoffenberg.

unaware of the nature of the charges against him or the consequences of pleading guilty. The events surrounding and preceding Hoffenberg's guilty plea make clear the deliberate and fully informed nature of Hoffenberg's decision to plead guilty.

Those events—including the defendant's responses to the Court's questions, the defendant's demeanor and his speech pattern—were properly within the Court's determination at the allocution of whether Hoffenberg was competent to plead guilty. *See United States v. Parkins*, 25 F.3d 114, 117–18 (in determining whether defendant understood nature of charges, court may review entire record before it, and need not consider allocution in isolation) (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 530, 130 L.Ed.2d 433 (1994); *United States v. Lora*, 895 F.2d 878, 881–82 (2d Cir.1990) (in determining whether a defendant understood the nature of the charges, court reviews the record "in its entirety"); *United States v. Stevens*, 19 F.3d 93, 94–96 (2d Cir.1994) (record and "history of the proceedings" suggest defendant's current argument was nothing more than last-minute, post-hoc attempt to create misunderstandings where none legitimately exist).

Following counsel's explanation of Hoffenberg's strategy in pleading guilty so as to allow him to litigate the issue of specific performance of the Agreement, the Court specifically questioned Hoffenberg about his understanding of the consequences of his decision to plead guilty and whether he understood what his attorney had said. Hoffenberg personally assured the Court that he understood his attorney's explication, Tr. at 7, and in his own words, explained to the Court his understanding of that strategy and its consequences. Tr. at 19. The Court told Hoffenberg his understanding was absolutely correct. Tr. at 19–20.

Further, Hoffenberg's statements at the plea proceeding demonstrated that he fully understood the complex charges to which he was pleading guilty. The Court addressed Hoffenberg personally, and Hoffenberg explained—at length and in his own words—three of the five complex charges. He explained how he conspired to commit securities fraud, including his use of false financial statements prepared by three separate accounting firms in order to sell bonds, notes and debentures. Hoffenberg answered the Court's follow-up questions directly and responsively, expanding upon his answer where appropriate. When Hoffenberg's attorney briefly explained the two mail fraud counts, Hoffenberg again responded appropriately to follow-up questions put to him by the Court. Tr. at 25, 27.

It was only after listening to Hoffenberg's lucid responses to questions designed to elicit Hoffenberg's understanding of the charges, the consequences of the plea, and Hoffenberg's personal living and employment situation, that the Court—having previously advised Hoffenberg that it wished to ascertain whether there was "anything which would make it difficult for you to understand the nature of the charges and the consequence of your plea"—asked:

> In the last twenty-four hours, have you used any drugs, pills, narcotics, anything that would affect your ability to understand these proceedings?

Tr. at 22.

Hoffenberg unequivocally responded, "No, Your Honor." *Id.*

Hoffenberg's responses established that Hoffenberg understood the nature of the charges and the implications of pleading guilty, and that he was mentally competent to plead guilty. His sworn statements that he had not taken any drugs within the previous 24 hours and his failure to identify anything that would affect his ability to understand those proceedings, also gave the court a firm basis for concluding that Hoffenberg was not under the immediate influence of any drug such that his comprehension or judgment could be materially distorted. *See U.S. v. Gonzalez*, 970 F.2d 1095, 1101 (2d Cir. 1992) (defendant's statements at a plea proceeding "carry a strong presumption of verity," and "are conclusive absent credible reasons justifying departure from their truth") (citations omitted); *United States v. Napolitano*, 212 F.Supp. 743, 747 (defendant's admissions at guilty plea are "solemn declarations ... not to be lightly disregarded in

favor of his present self-serving assertion") (S.D.N.Y.1963).

The circumstances of Hoffenberg's plea are distinguishable from those which provided the basis of the *Rossillo* holding. In *Rossillo*, the Court of Appeals vacated the plea because there was nothing in the record to show that the court below fulfilled its Rule 11 obligation to ensure that the defendant fully understood the nature of the charges and the consequences of the plea. The trial court received no answer to its question about whether the defendant was under the influence of medication. *Rossillo*, 853 F.2d at 1065.[4] Here, by contrast, Hoffenberg's responses to the Court's questions as to whether Hoffenberg was under the influence of medication supplied the basis for the Court's conclusion that Hoffenberg fully understood the plea.

## II. *Any Rule 11 Violation Was Harmless Error*

■ In *United States v. Basket*, 82 F.3d 44, 47–49 (2d Cir.1996), the Second Circuit explicitly held that the harmless error analysis of Rule 11(h) applies to any and all Rule 11 violations. Prior to *Basket*, some courts had interpreted Rule 11(h) narrowly, suggesting it applied it only to "minor or technical violations of the Rule." *Basket*, 82 F.3d at 48 (citing *United States v. Gonzalez*, 820 F.2d 575, 579 (2d Cir.1987)); 1983 Advisory

Committee Notes to Fed.R.Cr.P. 11. In *Basket*, the Second Circuit determined that the harmless error analysis set forth in Rule 11(h) applied to all failures to comply with Rule 11. *Id.* at 49.[5]

Even if the Court technically violated Rule 11 by failing to inquire whether Hoffenberg had taken medications more than 24 hours before the plea and the effect of such medications, any such violation would constitute harmless error under *Basket*. As set forth above, the record shows that Hoffenberg pleaded guilty voluntarily, with a full understanding of the nature of the charges and the consequences of the plea. Thus, even if the Court had probed further, as Hoffenberg claims it should have, the Court would have nonetheless found Hoffenberg competent. Accordingly, the alleged error resulted in no prejudice to Hoffenberg.

In addition to the ample evidence at the hearing itself, the evidence concerning Hoffenberg's condition [6] submitted in connection with the instant motion establishes that even if the Court committed a technical violation of Rule 11, the Court's error was not prejudicial to Hoffenberg. Although Hoffenberg was hospitalized in 1970, and received electroconvulsive therapy and anti-psychotic medications such as thorazine and the mood stabilizer lithium, no further treatment involving drug medication was reported until 1995, despite episodes of depression in the

4. The cases relied on by the *Rossillo* court similarly involved total omissions: the complete failure of a trial court to ask if the defendant had been induced into entering a guilty plea by threats or promises not contained in the plea agreement, *see Gonzalez*, 820 F.2d at 579 (2d Cir.1987), and the failure of a trial court to inform the defendant of the maximum sentence for his offense, his right against compulsory self-incrimination, and that a plea would mean that there would be no trial. *See United States v. Journet*, 544 F.2d 633, 636–37 (2d Cir.1976).

5. The district court in *Basket* violated Rule 11 by failing to inquire whether the plea was the result of any promises or discussions between the defendant and his attorney or the Government. The defendant later moved to withdraw his plea, claiming that he had an oral agreement that, if he cooperated, he would receive a 5K letter. *Id.* at 46. The Second Circuit held that the failure of the district court to inquire about promises made to the defendant was harmless because subse-

quent to the plea, the defendant willingly entered an Agreement with the Government that he would receive a 5K letter only if he cooperated *and* the Government deemed his cooperation substantial. The Government ultimately determined that the defendant's cooperation was limited and therefore declined to write a 5K letter. *Id.* at 49. The Second Circuit found that the defendant was not prejudiced by any misunderstanding at the time of the plea because he could have—but did not—decline to sign the post-plea Agreement when he learned that it did not automatically provide for a 5K letter.

6. As set forth above, the record on this subject consisted of the transcript of the April 20, 1995 plea allocution, the reports of Drs. Dudley, Drob and Berger, the notes of Drs. Walder and Hoffman, the records of Hoffenberg's hospitalization in 1970 for manic depressive illness, and the Probation Department Investigation Report prepared in connection with Hoffenberg's arrest in 1970.

late 1970's and 1980's. During the months of March and April of 1995, Hoffenberg had been under the care of several doctors, who agreed that he was suffering from a major depressive episode, and that Hoffenberg had been using several forms of medication, including homeopathic and herbal medication, Prozac and Klonopin.

Dr. Hoffman, the psychiatrist who treated Hoffenberg less than a month before the plea, found him "cognitively intact" and noted on March 24, 1995, that "[d]epression and anxiety have been a problem [for Hoffenberg] for at least one year and has been intensifying in the past several months.... During this past year, [Mr. Hoffenberg] has felt depressed, anhedonic and hopeless.... Suicidal ideation is present but has no intent.... The patient is suffering from crippling anxiety.... Because we are likely dealing with Bipolar Disorder, type II, a stabilizer ... should be started soon." The records of Dr. Walder, the psychologist who treated Hoffenberg in March and April 1995, likewise indicate that Hoffenberg was suffering from anxiety and depression the day before he entered his plea. Dr. Walder was aware of the anticipated plea and did not recommend cancellation or adjournment.

The evidence submitted in support of this motion—evidence of Hoffenberg's previous mental illness and his depression at the time of the plea—does not amount to a showing that Hoffenberg was not competent to plead guilty. Although Dr. Dudley's report concluded that Hoffenberg was suffering from a "Major Depressive Episode," Dr. Dudley did not attest that Hoffenberg consequently suffered an impairment of his ability to understand the nature of the charges and the consequences of the plea either as a result of his depression or his drug regime. Instead, Dr. Dudley speculated that Hoffenberg's thinking and judgment "could have been influenced by both his Major Depressive Episode and one or more of the medications he was taking." Moreover, Dr. Dudley did not take into account the significance of the transcript of Hoffenberg's sworn guilty plea, which is the best available evidence of Hoffenberg's mental state on the day in question. Finally, Dr. Dudley's credibility is undermined by his inconsistent statements that, at the time of the plea, Hoffenberg was not taking a sufficient dosage of Prozac to affect his depression and that nonetheless Hoffenberg's judgment could have been impaired by the Prozac.

Although Dr. Dudley described Hoffenberg's depressive episodes as incapacitating, and Hoffenberg describes his mental state on the day of the plea as being like a "vegetable," the notes of Dr. Walder's and Dr. Hoffman's visits and phone calls with Hoffenberg show that in the days before the plea, Hoffenberg was actively focused on his life, his activities, and his future. Three days before the guilty plea, Hoffenberg called Dr. Hoffman to ask about his insurance and to report that his mood was calmer. The day before the plea, Hoffenberg met with Dr. Walder and told him that he would plead guilty the following day, that he would be assassinated by the media, and that he was feeling less depressed. Hoffenberg was realistically facing up to his situation, and preparing to move on to the next stage of his legal proceedings and his life. Walder did not suggest in any way that Hoffenberg could not proceed with the plea the following day or that he should alter his regimen any way.

Moreover, the Government's psychiatric expert, Dr. Berger, has asserted that Hoffenberg's depression did not impair his ability to approach the plea with clarity and understanding:

It is apparent, from a psychiatric analysis of the data in conjunction with a psychological understanding of Mr. Hoffenberg, that as he approached the certainty of taking his plea, and after the Court rejected his motion regarding enforcing the Agreement thereby making the sentencing outcome less certain, that he became depressed. It is common for defendants to experience a reactive, depressive adjustment to this particular stressor. For Mr. Hoffenberg, such circumstances led to a gradual peeling-away of usual narcissistic defenses thereby allowing him to more clearly see the gravity and the certainty of his situation. This depressive reaction is actually further proof that he appreciated the nature and consequences of his circum-

278

stances. This depression was not "debilitating" as Ms. Hasho describes to Dr. Dudley; rather, he mobilizes his psychological resources to deal effectively and appropriately in light of the circumstances.

. . . . .

[In March 1995] it appears that the defendant was actually more perceptive and had even greater insight during this period than he would usually have during egotistical flights and self-absorbed fancy. There is always a price to pay for this clarity, for giving up one's narcissistic defenses which have protected one from the anxieties and fears that others experience; that price is depression, but not a debilitating depression, rather a depression that motivates one to better themselves.

Berger Report.

Dr. Berger's detailed analysis of Hoffenberg's plea allocution shows that Hoffenberg understood the proceedings. For example, Dr. Berger explained that Hoffenberg's response when the Court asked whether he understood the ten pages of colloquy concerning the cooperation agreement and the litigation surrounding it, rather than a simple "yes" answer, was,

coherent, relevant, articulate, goal directed, and logical. It is a spontaneous elaboration which was not required of him and as such exceeds that which would be expected of a person incapacitated by a depressive condition. He is able to summarize, succinctly, all that was discussed in the ten page colloquy, and extract from that, the information which was relevant and essential to answering the Court's question. The level of mental functioning required to have achieved this is enormous (although taken for granted by most lay persons). It means that he would have had to have been attending to the proceedings, concentrating on what was being said, interpret complex legal notions, understand the Court's position on the issue, assimilate all this data and organize it properly in his mind, and be able to choose from all that data only that which was necessary to respond to the inquiry. Absent is any rambling speech, irrelevant comments, loose associations, flights into

fantasy, or, on the other hand, any thought blocking, inability to recall, lost train of thought, slowed speech, or incorrect assumptions.

Berger Report at 23.

Dr. Berger also analyzed Hoffenberg's response when he is asked to explain his activities with respect to count one of the charges. Commenting upon Hoffenberg's explanation of the criminal activity Hoffenberg engaged in, Dr. Berger stated:

Not only does the defendant dispel any questions of cognitive, attentive, or memory impairments, naming specific law and accounting firms and the location of their operational offices, he is able to synthesize and extract from the many activities these firms engage in the exact activity relevant to his charges, and the way in which this involved him. The level of mental functioning including ability to abstract, recall, assimilate, compare, and relate similar and opposing functions, that is evidenced here is superior. Additionally, the statement is without any evidence of thought process disturbance. Absent is the slowed, hesitant, uncertain speech of the depressive, and equally absent is the pressured, rambling tangential speech of the manic.

Berger Report 25–26.

Dr. Drob, the psychologist retained by the Government, analyzed the results of Hoffenberg's psychological testing, similarly concluded that Hoffenberg was depressed at the time of the plea, but that there is no evidence to indicate that his functioning was impaired. Drob explained:

Depression in and of itself should not be considered a bar to [Hoffenberg] having properly allocuted. Many defendants are indeed depressed when they plead guilty to a criminal charge. In fact, depression is a natural response to being charged with a criminal offense for which one can serve significant jail time, lose one's business interests, suffer financial loss, etc., the very circumstances that Mr. Hoffenberg found himself on April 20, 1995.

. . . . .

A review of the notes of [Hoffenberg's] treating clinicians just prior to his allocution reveals no evidence to suggest that his cognitive abilities were impaired at the time of his allocution. On the basis of these notes, it is clear that in contrast to some depressed patients, Mr. Hoffenberg (1) shows interest and concern about both his future life and the outcome of his case, and (2) had shown some signs of improvement in the days prior to his allocution. It is, perhaps also significant that Mr. Hoffenberg spoke to Dr. Walder about his guilty plea the day before his allocution, and [Dr.] Walder does not question his competency to enter into such a major life decision. Further, Dr. Walder does not note any cognitive impairment which would impair Mr. Hoffenberg's judgment or thought processes.

Drob Report at 8–9.

Dr. Drob concluded that Hoffenberg's present description of his mental state at the time of the plea—as presented to Dr. Dudley by Hoffenberg—is highly suspect because the results of testing show that "Hoffenberg's personality structure is such that he is willing, more than the average person, to manipulate the truth to his advantage." Drob Report at 9. In addition, there is no evidence in this record that the drugs which had been prescribed would render Hoffenberg incapable to plead voluntarily.

In sum, neither the notes of Drs. Walder and Hoffman, nor the report of Dr. Dudley, nor the drugs that had been prescribed support the claim that Hoffenberg's depression impaired his ability to plead guilty. On the contrary, the record refutes any such contention and establishes that Hoffenberg's plea was entered into voluntarily, with a full understanding of the nature of the charges and the consequences of the plea. Accordingly, the Court's failure to ask certain questions about Hoffenberg's mental state was harmless.

Hoffenberg has not met the standard for demonstrating that he is entitled to withdraw his guilty plea. Hoffenberg's claim that he was suffering from anxiety and that he had been under medication for bipolar mental disorder does not under these circumstances

constitute the requisite showing of a fair and just reason for withdrawal of the plea. *See* Fed.R.Cr.P. 32(e); *United States v. Vega*, 11 F.3d 309, 313 (defendant who moves to withdraw his plea has the burden of satisfying the court that there are valid grounds for withdrawal) (2d Cir.1993).

### III. *No Competency Hearing Was Required*

Hoffenberg has also contended that the evidence of his mental illness was sufficient to require the Court to *sua sponte* order a competency hearing, and that the Court's failure to do so denied Hoffenberg due process.

Title 18, United States Code, section 4241(a), requires a district court to order a competency hearing *sua sponte* if there exists reasonable cause to believe that a defendant is unable to assist properly in his defense or is incapable of understanding the consequences or the nature of the proceedings against him. 18 U.S.C. § 4241(a); *United States v. Lebron*, 76 F.3d 29, 32 (1st Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 2537, 135 L.Ed.2d 1060 (1996); *United States v. Fuller*, 15 F.3d 646, 649 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2689, 129 L.Ed.2d 820 (1994).

In deciding whether a competency hearing is required, a trial court is required to consider only the evidence before it. If no such evidence is presented, a hearing is not required. *See, e.g., Chichakly v. United States*, 926 F.2d 624, 632 (7th Cir.1991) (no need to conduct competency hearing in absence of evidence of incompetency and in absence of request by defense attorney); *United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir.1986) ("failure to conduct a full competency hearing is not a ground for reversal when the defendant appears competent during trial"), *cert. denied*, 479 U.S. 1036, 107 S.Ct. 888, 93 L.Ed.2d 841 (1987).

Here, there was no evidence to alert the Court that a competency hearing was required and no such suggestion was advanced by highly skilled defense counsel. Indeed, on the contrary, during his allocution, Hoffenberg demonstrated his under-

standing the consequences and the nature of the proceedings against him. The only fact of which the Court was aware that arguably could have prompted a competency hearing was Hoffenberg's statement about being treated for anxiety.

No medical evidence before the court indicates that anxiety on the day of a significant court appearance requires a competency hearing. Indeed, such a condition is a common-sense reaction to the circumstance. Furthermore, as set forth in greater detail above, the Court observed Hoffenberg's demeanor and listened to his coherent, clear answers to numerous questions put to him during the course of the allocution. There was no evidence then or now to suggest any reason to conduct a hearing, and neither defense counsel, the prosecuting attorney, nor the judge saw a need for one. Accordingly, no hearing was required.

### Conclusion

For the reasons set forth above, Defendant's motion to withdraw his plea is hereby denied. Sentencing with take place during the week of December 9, 1996 at a time to meet the convenience of counsel.

It is so ordered.